MARION EDWARD PEARSON, JR.,    )
                                )
      Petitioner,                 )
                                )
      v.                       )        **O R D E R**
                                )
RANDALL LEE, et al.          )
                                )
      Respondent.           )
_____)

**THIS MATTER** is before the Court on Petitioner's Petition for Writ of Habeas Corpus filed February 28, 2006 (Doc. No. 1); Respondent's Motion for Summary Judgment filed April 13, 2006 (Doc. No. 16); Petitioner's Response in Opposition to the Motion for Summary Judgment filed May 15, 2006 (Doc. No. 21); Petitioner's Motion for Judgment on the Pleadings also filed May 15, 2006 (Doc. No. 24); Petitioner's Motion for Judgment as a Matter of Law filed April 30, 2007, (Document No. 48); Petitioner's Motion for Summary Judgment filed January 9, 2008 (Doc. No. 56); Petitioner's Motion for an Order of Compliance filed February 13, 2008 (Doc. No. 59); Petitioner's Motion for Financial Assistance to Obtain Expert Services also filed February 13, 2008 (Doc. No. 60) and Petitioner's Motion to Produce Documents filed April 16, 2008 (Doc. No. 62).[1]

_____

[1] It should be clear, based on the number of motions pending, why this Court has been unable to get to the merits of Petitioner case. In addition to the motions currently pending, the Court has ruled on several motions filed by Petitioner. These motions include: a Motion for Order of Stenographic Transcription (Doc. No. 6), which was denied on March 28, 2006 (Doc. No. 9); Motion for Leave to Append Unlisted Parties (Doc. No. 13), which was denied on April 12, 2006 (Doc. No. 15); Motion for Sanctions (Doc. No. 27), which was denied on July 23, 2006 (Doc. No. 31); Revised Motion for Sanctions (Doc. No. 32), which was denied August 1, 2006; Motion for Preliminary Hearing (Doc. No. 35), which was denied on August 14, 2006 (Doc. No.

Because Petitioner was not satisfied that this Court would rule on his Petition in the time he expected, Petitioner filed a petition for writ of mandamus with the Fourth Circuit Court of Appeals seeking an order directing this court to rule on his petition.  On June 20, 2008, Respondent filed a response to Petitioner's petition for a writ of mandamus in which counsel "took no position on whether [the Fourth Circuit] should issue a writ of mandamus" but gratuitously pointed out that "Respondent would, of course, like the District Court to act on Petitioner's § 2254 petition . . . ."[2] In response, the Fourth Circuit has directed that this Court respond to Petitioner's petition for a writ of mandamus within thirty days from August 7, 2008.  The Petitioner has essentially been allowed to skip in line despite the fact that Petitioner's case is not this Court's oldest case of this nature or the most pressing.  This is a classic example of the squeaky wheel getting attention.  Instead of responding to Petitioner's petition for writ of mandamus, which would further usurp this Court's fleeting resources, this Court chooses to address the claims contained in Petitioner's habeas petition.  For the reasons stated in this Order, Petitioner's habeas petition is denied and Respondent's Motion for Summary Judgment is Granted.

## I. PROCEDURAL BACKGROUND

On September 21,1998, Marion Edward Pearson (Petitioner) was indicted on four counts of first-degree rape, two counts of first-degree sexual offense, two counts of first-degree burglary , and

36); Motion for Assistance of a Law Student (Doc. No. 27),  which was denied on August 21, 2006 (Doc. 40); Motion for a Hearing (Doc. No. 49), which was denied on July 27, 2007 (Doc. No. 53) and Motion to Amend (Doc. 51), which was granted on July 27, 2007 (Doc. No. 53).

[2] Curiously, Respondent's counsel stated that she "has no actual insight as to why [this] Court has not [yet] ruled on [Petitioner's] § 2254 petition," yet she correctly opined that it may be due to the fact that the grounds Petitioner raised were complex and, as the Court has already pointed out, Petitioner filed several miscellaneous motions and documents in which he added or sought to add materials and claims to his § 2254 petition.

one count of robbery with a dangerous weapon.

On January 11, 2000, Petitioner tendered an <u>Alford</u> plea to two counts of second-degree rape as part of a plea agreement. Pursuant to his plea agreement, Petitioner reserved the right to challenge Judge Boner's pretrial orders denying his motions to suppress nontestimonial evidence and the State agreed to dismiss the remaining charges against Petitioner, but reserved the right to prosecute him on all charges if Petitioner succeeded in challenging Judge Boner's rulings denying the suppression motions.

Judge Boner sentenced defendant to consecutive prison terms of twenty-five years. The Court of Appeals, with one judge dissenting, found no error. Defendant appealed to the North Carolina Court of Appeals, and in a published opinion filed August 21, 2001, a majority panel of that court, concluded that there was no error in Judge Boner's denial of Petitioner's motions to suppress. <u>State v. Pearson</u>, 145 N.C. App. 506 (2001). Petitioner noted an appeal of right to the Supreme Court of North Carolina based upon the dissenting opinion and based upon a substantial constitutional question. The North Carolina Supreme Court allowed the State's motion to dismiss the notice of appeal concluding that there was not a substantial constitutional question. The court ordered that it would consider only those issues forming the basis of the North Carolina Court of Appeals dissenting opinion. While Petitioner's case was pending in the North Carolina Supreme Court, Petitioner filed several motions to have his counsel[3] removed and to address the Court himself, which were denied or dismissed by the court. In a unanimous opinion filed June 29, 2002, the Supreme Court of North Carolina affirmed Petitioner's convictions. <u>State v. Pearson</u>, 356 N.C. 22 (2002). Petitioner's subsequent pro se petition for writ of certiorari filed in the United States

---

[3] Petitioner was represented by Mr. Robert Ervin.

Supreme Court was denied on January 13, 2002. <u>Pearson v. North Carolina</u>, 537 U.S. 1121 (2003).

On January 2, 2003, Petitioner filed a Motion for Appropriate Relief (MAR) in the Superior Court, Burke County. Senior Resident Judge Beverly Beal ordered the State to respond and appointed Petitioner an attorney. The MAR evidentiary hearing was held on September 13 through 16, 2004 before Superior Court Judge Anderson D. Cromer. Petitioner, who had previously been appointed counsel on two occasions, represented himself. In a detailed order entered June 10, 2005, Judge Cromer dismissed Petitioner's MAR and denied him all requested relief. On December 1, 2005, Petitioner filed a petition for writ of certiorari with the North Carolina Court of Appeals, which was denied on December 16, 2005.

Petitioner mailed the instant § 2254 petition to this Court on February 27, 2006 and it was filed on February 28, 2006. Petitioner raises the following eight grounds for relief: (1) that the trial court failed to satisfy itself that there was evidence of Petitioner's guilt before imposing a criminal sentence; (2) that his counsel's failure to request a hearing and motion for the destruction of nontestimonial products and reports was ineffective assistance of counsel; (3) that counsel's advice to plead guilty was tainted by his incompetent representation for the suppression of evidence; (4) that neither the prosecutor, the judge, nor his counsel informed him of the direct and indirect consequences of pleading guilty; (5) that the adjudication of the Fourth Amendment issues involved an erroneous or unreasonable application of the <u>Terry</u> doctrine; (6) that the adjudication of the Fourth Amendment issues was contrary to <u>Davis v. Mississippi</u> and <u>U.S. v. Place</u>; (7) that the trial court's resolution of the Fourth Amendment search and seizure issues resulted from an unreasonable determination of the facts in light of the evidence; and (8) that his counsel's imprudent acts are proof that his representation was burdened by materially conflicting interests.

4

## II. STATEMENT OF FACTS

The relevant facts were summarized by the North Carolina Supreme Court as follows:

On 7 March 1985, the Morganton Police Department received a report of a Peeping Tom in the Village Creek Apartments complex. When Lieutenant James Buchanan responded to the call, he saw a black man wearing a light gray or blue windbreaker and blue jeans, squatting beside an air-conditioning unit directly behind an apartment building. The suspect ran when he saw Buchanan. Buchanan lost the suspect and notified other officers to stop two cars that were leaving the complex. Defendant was driving one of the cars and was wearing a light blue windbreaker and blue jeans. When interviewed later about this incident, defendant claimed he was going to a friend's apartment in the complex, but he could not remember the friend's name.

At 1:15 a.m. on 14 July 1985, Kathy Richards reported to the Morganton Police that while she was asleep on her couch a man entered her apartment, held a knife to her throat, and raped her. Richards had been asleep on her couch when she was attacked. The man also took thirty-eight dollars from her wallet. Richards could not see the man but believed he was a twenty-five to thirty-five-year-old white male who was over six feet tall. Police found the screen to Richards' bathroom window had been partially removed, and it appeared someone had crawled through the window. The State Bureau of Investigation (SBI) obtained from the apartment a partial Negroid hair that was not suitable for scientific comparison. A sexual assault examination was completed on Richards at the hospital.

At 1:10 a.m. on 23 November 1985, Arlene Holden called the Morganton Police and reported that a man broke into her apartment at the Village Creek Apartment, disabled her lights in her bedroom, hid in her bedroom, and raped her. Before raping Holden, the man struck her in the head, tied her up with pantyhose, and covered her face, using pinking shears to threaten her. The man performed oral sex on Holden and raped her twice. After raping Holden the first time, the man made sure her face was covered, turned on the lights, and looked for money. Holden described the man as having a dark complexion and being five feet eight inches tall, with a lean or medium build. The screen had been removed from an unlocked window in Holden's bedroom. Negroid public hair and body hairs were found in trace evidence examined by the state crime lab. A sexual assault examination was done on Holden at the hospital.

Investigators developed defendant as a suspect in the Holden rape at the Village Creek Apartments based on the Peeping Tome incident in March 1985 at the apartment complex. Investigators interviewed defendant on 26 November 1985. Defendant denied any involvement in the Holden rape and left the interview with a cooperative attitude.

Between 11:30 and 11:40 p.m. on 17 February 1986, Ernestine Kyes was attacked in

her bedroom. After showering, Kyes attempted to turn on her bedroom light, but it would not work. Kyes' attacker threatened her with something that felt like a knife, covered her head with a towel, performed oral sex on her, forced her to perform oral sex on him, and then raped her. The attacker took approximately forty dollars from Kyes' purse and then raped her again. The man knew the name of Kyes' children and where they went to school. Defendant's son attended the day care that Kyes directed, and the defendant sometimes brought his son to and from the day care. Kyes described her attacker as a black man between five feet eight inches and five feet ten inches tall, with an average build. Evidence found on Kyes' clothing and bed covers included Negroid hairs. A hospital assault examination was completed on Kyes at the hospital. Public combings of the victim contained Negroid hairs.

Both Holden and Kyes described their attacker as someone of medium height. Holden said he was five feet eight inches tall, and Kyes said he was between five feet eight and five feet ten inches tall. Additionally, Holden and Kyes said he was of medium build. Holden said he had a lean, medium build, and Kyes described him as having an average build. Further, both women described their attacker as dark-skinned. Holden described her attacker as having a dark complexion, and Kyes said her attacker was a black male. At the scenes of both the Holden and Kyes rapes, Negroid hairs were found. Defendant is a black male, slender and muscular, and stands approximately five feet eight inches tall.

After the report of Kyes' rape, investigators intensified the focus of the investigation of defendant. At 1:30 a.m. on 18 February 1986, after learning of the Kyes rape, SBI agent John Suttle drive directly to the defendant's house and noted that the hood of defendant's car was warmer than others in the lot, as if it had been recently driven. Police interviewed defendant again on 18 February 1986. Defendant claimed that he did not leave home after 11:00 p.m. on the night of the rape, 17 February 1986.

On 28 March 1986, Agent Suttle completed an application for a nontestimonial identification order (NIO) to get head and public hair samples, a blood sample, and a saliva sample from defendant. In his affidavit, Agent Suttel stated:

> During the early hours of 11-23-86, a white female [Holden] age 26, living at Village Creek Apartments was raped twice by a male suspect that entered her apartment via an unlocked window, The suspect was described by the victim as being approx. 5'8" tall, lean medium build with a dark complexion speaking with a fake accent. On the night of 2-17-86, a white female [Kyes] age 34, living at Woodbridge Apts was raped twice by a male suspect that had entered her apartment via an unlocked window. The victim described her assailant as being 5'8" to 5'10", medium build, "not light and not heavy". Two Negroid public hairs were found at the second rape.

Marion Pearon [defendant] is a black male, slender and muscular, approx. 5'8" tall. Pearson was caught by Lt. James Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1985 around 9:00 p.m.

Later that day, Judge Claude Sitton signed an NIO requiring defendant to appear at the Morganton Police Department on 8 April 1986 and submit to the nontestimonial identification procedures. The order was served on defendant on 1 April 1986. At the time the order was served, defendant was "belligerent and antagonistic" and refused to sign and acknowledge his receipt of the order. Defendant testified on voir dire at a motions hearing that he went to the office of the Clerk of the Superior Court to request appointment of counsel and was told that no attorney could be appointed until he was charged with a crime.

On 8 April 1986, defendant went to the Morganton Police Department. Defendant testified he asked for an attorney again at this time but was not given one. Pursuant to the NIO, head and public hair samples, a saliva sample and a blood sample were taken from defendant. Subsequent testing of the evidence showed that defendant's blood type would not be detectable from the semen left by the rapist. The testing also showed that a pubic hair found on victim Holden's sweater had similarities and dissimilarities to defendant's hairs and that two pubic hairs found on victim Kyes were microscopically consistent with defendant's hairs and could have come from him. Defendant was therefore not excluded as a suspect.

On 15 May 1986, after crawling into an occupied women's rest room stall in Morganton, defendant was arrested and sentenced to two years in prison for secret peeping. Defendant was arrested in June 1991 for a Peeping Tom offense in Maryland. Defendant was subsequently arrested in Maryland five more times for secret peeping offenses.

In March 1998, when DNA technology became available, Agent Suttle submitted to SBI Agent Brenda Bissette the sexual assault kits from victims Holden and Kyes and the samples taken from defendant pursuant to the 1986 NIO. Agent Bissette, a DNA analyst in the Molecular Genetics Section of the SBI, determined that defendant's DNA was present in both the Kyes kit and the Holden kit and concluded that only one African-American in 34 million would have the same DNA match found in the Holden kit. Bissette also said that a new blood sample from defendant could produce more definitive results.

On 23 November 1998, Agent Suttle was granted a search warrant to obtain a new blood sample from defendant. The warrant application was based on all the information concerning the crimes, including Agent Suttle's notation that defendant's car felt warm to the touch, immediately after the Kyes rape was reported, defendant's arrest and conviction for entering an occupied rest room on 15 May 1986, the results of the DNA analysis of the samples obtained in 1986, and other information including defendant's multiple arrests for Peeping Tom offenses in Maryland. The search warrant was issued and served on defendant. SBI tests on the new blood revealed more definitive results identifying defendant as the perpetrator. From the new blood sample, Agent Bissette determined that only one African-

American in 280 million would have the same DNA match found in both the Holden kit and the Richards Kit.

Pearson, 356 N.C. at 24-28.

### III. STANDARD OF REVIEW

Generally speaking, the standard of review to be applied by the Court to habeas cases is "quite deferential to the rulings of the state court." Burch v. Corcoran, 273 F.3d 577, 583 (4th Cir. 2001). Indeed, as the Burch Court noted:

> [p]ursuant to the standards promulgated in 28 U.S.C. § 2254, a federal court may not grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court proceedings unless the state court's adjudication; (1) "resulted in a decision that was contrary to, or involved as unreasonable application of, clearly established Federal laws, as determined by the Supreme Court of the United States" . . . ; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . ."

Id. (Internal citations omitted).

The Supreme Court has explained that a state court adjudication is "contrary" to clearly established federal law, only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000), quoted in Burch. An unreasonable application is different from an incorrect application of federal law, the former being the requisite showing. Therefore, this Court may not issue the writ even if it concludes in its own independent review, that the relevant state court merely made an incorrect or erroneous application of the correct federal principles. Id.

Finally, the applicable standard of review is to be applied to "all claims 'adjudicated on the merits," that is, those claims substantively reviewed and finally determined as evidenced by the state

court's issuance of a formal judgment or decree." Thomas v. Davis, 192 F.2d 445, 455 (4th Cir.

1999).

## IV. ANALYSIS

### A. Petitioner's Guilty Plea Proceedings (Grounds 1 and 4)

In ground one of the Petition, Petitioner claims that the trial court failed to satisfy itself that

there was evidence of his guilt before imposing a criminal sentence.[4]  In ground four of the Petition,

Petitioner alleges that neither the prosecutor, the judge, nor his counsel informed him of the direct

and indirect consequences of pleading guilty.[5]  In both grounds one and four, Petitioner is essentially

challenging his guilty plea as being unknowing and involuntary.

The choice to plead guilty must be "a voluntary and intelligent choice among the alternative

courses of action open to the defendant."  North Carolina v. Alford, 400 U.S. 25, 31 (1970).  The

defendant must be advised of the direct consequences of the plea, meaning those having "a definite,

immediate and largely automatic effect on the range of the defendant's punishment."  Cuthrell v.

Director, Patuxent Inst., 475 F.2d 1364, 1365-66 (4th Cir. 1973).  However, "before pleading guilty,

the defendant need not be advised of all collateral consequences of his plea," those being the

"possible ancillary or consequential results which are peculiar to the individual and which may flow

from a conviction of a plea of guilty.  Id. (Citations and internal quotation marks omitted.)

---

[4] Petitioner filed a Motion to Amend (Doc. No. 57) this claim to include prosecutor
misconduct and ineffective assistance of counsel.

[5] In support of this claim, Petitioner argues that the "plea was neither necessary or prudent
for the protection of fourth amendment rights and priviledges [sic]; plea exposes to mutilpe [sic]
prosectuion [sic] while releasing the attorney from his obligation to represent; implicit right to
search in undisclosed statute; suppression motion reasonably known to contain fatal flaws; plea
destroys Petitioner's standing to sue for misconduct that caused damage."  (§ 2254 Petition ¶ 12,
ground four).

The law is clear that a defendant's knowing, voluntary, counseled guilty plea, is itself constitutionally sufficient to support his conviction and leaves nothing remaining but sentencing. See Boykin v. Alabama, 395 U.S. 238 (1969) (noting requirements for valid guilty plea). Absent compelling circumstances, a petitioner's solemn in-court representations on a printed transcript of plea form should be deemed conclusive. See Via v. Superintendent, 643 F.2d 167 (4th Cir. 1981); Little v. Allsbrook, 731 F.2d 238 (4th Cir. 1984) (stating that absent clear and convincing evidence to the contrary, a defendant is bound by what he said at the time of the guilty plea, and defendant's answers under oath to inquiries as to whether he has discussed the case fully with counsel and whether the plea was induced by promises or threats were not perfunctory statements and could not be lightly disregarded as inconsequential procedural dialogue). As the Supreme Court held in Blackledge v. Allison, 431 U.S. 63, 73-74 (1977), "representations of the defendant, his lawyer, and the prosecutor at such a [guilty plea] hearing as well as any findings made by the judge accepting the plea constitute a formidable barrier in subsequent collateral proceedings."

Neither Petitioner's allegations nor anything in the record is sufficient to breach the formidable barrier of Blackledge. Indeed, Petitioner's arguments are belied by his answers given during his plea colloquy with Judge Boner. During that colloquy, as reflected in the Transcript of Plea form and the stenographic transcript of Petitioner's plea hearing, Petitioner affirmed that he understood that he had a right to plead not guilty and receive a trial by jury, and that he understood he was foregoing certain constitutional and other rights by pleading guilty. (Transcript of Plea Form, Ex. 2 to Respondent's Motion for Summary Judgment at 141; Steno Tr. at 152, Ex. B to Petitioner's

Petition[6]).  Petitioner further affirmed that he understood the nature of his Alford[7] plea, in that under

his plea, he would be treated as being guilty even if he did not admit his guilt.  (Id.).  Judge Boner

informed Petitioner of the maximum sentence he could receive as a result of his plea.  (Id. at 143.)

The terms of Petitioner's plea agreement were read to Petitioner and included a provision specifying

that he could be exposed to multiple prosecutions if the appellate courts overturned Judge Boner's

ruling on his motions to suppress.  (Id. at 142; Steno. Tr. at 153-54).  Petitioner affirmed that the

terms constituted the full plea agreement; that he accepted them as such; that no one made any other

threats or promises to him causing him to enter into the plea; that he entered his plea fully

understanding what he was doing; and that he did not have any questions.  (Id.).  Petitioner further

affirmed that his attorney explained the charges to him and discussed possible defenses with him,

and that he was satisfied with his attorney's legal services.  (Id. at 141; Steno Tr. at 151-52.)  The

factual basis supporting Petitioner's plea was read aloud by the State at the plea hearing.    (Steno

Tr. at 155-64).  Furthermore, both the prosecutor and defense counsel signed the printed Transcript

of Plea form, certifying that its terms and conditions were correct.  (Transcript of Plea Form, Ex. 2

to Respondent's Motion for Summary Judgment at 142.)

        The record of Petitioner's plea colloquy with Judge Boner clearly establishes that Judge

Boner informed Petitioner of the direct consequences of his plea, including the terms of his plea, the

maximum sentences to which he was exposed, and the nature of the Alford plea into which he was

---

        [6] Petitioner has submitted the stenographic transcript of his pretrial suppression hearing
and guilty plea proceeding as an attachment to his § 2254 petition.  (See § 2254 Petition, Ex. B
(Steno. Tr. of January 10 and 11, 2000 proceedings)).  Hereinafter cited to as "Steno Tr."

        [7] North Carolina v. Alford, 400 U.S. 25 (1970) (holding that defendant may enter a guilty
plea maintaining his innocence when he believes pleading guilty is in his best interest and the
record contains strong evidence of guilt).

entering. Critically, Petitioner affirmed that he understood those consequences. Petitioner's contention that there was an insufficient factual basis to support his plea is belied by Judge Boner's finding of fact that there was a factual basis for the entry of the plea. This finding is presumed correct on federal habeas review, absent clear and convincing evidence to the contrary which Petitioner has not established. See § 2254(e)(1). Judge Boner also found that Petitioner's plea was his own informed choice, "made freely, voluntarily and understandingly." (Transcript of Plea Form, Ex. 2 to Respondent's Motion for Summary Judgment at 142) As is established by Petitioner's answers during the plea colloquy, this mixed finding is based upon a reasonable determination of facts in light of the record. It is not contrary to, nor involves an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, i.e. Boykin, 395 U.S. 238 and its progeny. Therefore, to the extent that Petitioner is claiming that his guilty plea was unknowing or involuntary, such claim is denied pursuant to § 2254(d) and (e).

Next, to the extent that Petitioner argues in ground (4) that his counsel was ineffective for allegedly not informing him of the consequences of his plea, this claim is without merit.

With respect to claims of ineffective assistance of counsel, a petitioner must show that counsel's performance was constitutionally deficient to the extent that it fell below an objective standard of reasonableness, and that he was prejudiced thereby. Strickland v. Washington, 466 U.S. 687-91 (1984). In order to satisfy the performance prong, the Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Id. at 689; see also Fields v. Attorney Gen. Of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1992). The prejudice prong is satisfied by showing that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The petitioner "bears the burden of proving Strickland prejudice." Fields, 956 F.2d at 1297, citing Hutchins, 724 F.2d at 1430-31. If the petitioner fails to meet this burden, a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1290, citing Strickland, 466 U.S. at 697. Furthermore, in considering the prejudice prong of the analysis, the Court must not grant relief solely because the petitioner can show that, but for counsel's performance, the outcome would have been different. Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998), cert. denied, 528 U.S. 855 (1999). Rather, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Id., quoting Lockhart v. Fretwell, 506 U.S. 364 U.S. 364, 369 (1993).

More critically here, a petitioner who alleges ineffective assistance of counsel following entry of a guilty plea has an even higher burden to meet. See Hill v. Lockhart, 474 U.S. at 53-57; Fields, 956 F.2d at 1294-99; and Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir.), cert. denied, 488 U.S. 843 (1988). The Fourth Circuit described the petitioner's additional burden in a post-guilty plea of ineffective assistance of counsel as follows:

> When a [petitioner] challenges a conviction entered after a guilty plea, [the] "prejudice prong of the [Strickland] test is slightly modified. Such a defendant must show that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

Hooper, 845 F.2d at 475; accord Hill, 474 U.S. at 59; and Fields, 956 F.2d at 1297.

In support of his claim, Petitioner specifies that the consequences his counsel failed to inform him of include the statutory authorization to obtain his DNA, information concerning an

unrelated matter pending with the North Carolina Department of Social Services and the effect his plea would have had on a lawsuit against the city and county. These are, for the most part, collateral consequences of Petitioner's plea, and counsel is not ineffective where he does not inform a defendant of them. Ostrander v. Green, 46 F.3d 347, 355 (4th Cir. 1995) ("Ordinarily, an attorney need not advise his client of the myriad 'collateral consequences' of pleading guilty." (Quoting United States v. McHan, 920 F.2d 244, 247 (4th Cir. 1990)).

With respect to the prejudice prong of Strickland, Petitioner has not argued that but for counsel's alleged deficiency, he would have insisted on going to trial. Moreover, given the weight of the evidence against him and the sentence Petitioner was facing if tried by a jury[8], a reasonable person in Petitioner's position would have still pled guilty and not insisted on going to trial even if counsel's performance were deficient. Petitioner's plea agreement allowed Petitioner to greatly limit his sentencing exposure, while being able to appeal Judge Boner's rulings on the admissibility of the most critical evidence against him.[9] Petitioner has not established either prong of the Strickland test and therefore has not established that his counsel was ineffective.

Moreover, Petitioner raised the substance of grounds (1) and (4) in his state-court MAR. The MAR court found that there was sufficient basis for Petitioner's plea and that he 'understood at the time of its entry each and every aspect of the plea and each and every meaningful consequence of its acceptance by the trial judge. (Ex. 19 at 5 ¶ 6 and 6 ¶ 10(g)). With respect to Petitioner's claim that his counsel was ineffective for failing to inform him of the consequences of his plea, the MAR

---

[8] Petitioner was facing multiple life sentences based on his indictment for five counts of first-degree rape.

[9] Petitioner reserved the right to appeal Judge Boner's ruling on his motion to suppress.

court found the following:

> f.    Ervin properly advised Pearson concerning all matters relating to the negotiations of and entry of Pearson's plea. Ervin's advice to Pearson that the option offered by the State to allow Pearson to plead guilty to two Second Degree Sexual Offenses (and be exposed to two consecutive 25 year sentences) as opposed to being tried for multiple First Degree Sexual Offenses (and being exposed to multiple life sentences) was sound.
>
> The reservation of the right to appeal the trial court's adverse rulings on Pearson's motions to suppress was logical and prudent, in that it reserved the principal issue dealing with "inculpatory" evidence, sought to be suppressed, for appellate review without waving any argument. Ervin never guaranteed Pearson a favorable appellate decision. Moreover, Ervin never submitted the chances of a favorable appellate result to Pearson in such a way as to encourage Pearson to forego analyzing the merits of the proffered plea standing alone. In addition, Ervin properly advised Pearon of his appellate rights. Pearson claims that Ervin did not tell him that if he pled guilty to Second Degree Sexual Offense that he would be required to provide a DNA sample to the state. With respect to this claim, the court finds that even if Ervin did not advise him of this consequence of entering the plea, Ervin's assistance of counsel was not ineffective. Any DNA sample that was obtained via imprisonment post-guilty plea conviction would not have been utilized against Pearon if Pearson ultimately succeeded on his appellate claims on the reserved issues.
>
> g.    The plea entered by Pearson was his informed choice and was freely, voluntarily, and understandingly made. The Court finds that Ervin advised Pearon properly and Pearson understood at the time of its entry each and every aspect of the plea and each and every meaningful consequence of its acceptance by the trial judge. Even assuming Pearson's testimony and argument that he did not know that a sample of his DNA would be obtained if found guilty of Second Degree Sexual Offense, this fact would not vitiate the entry of his plea, as it was his informed choice, made freely, voluntarily and understandingly.

(MAR Order, Ex. 19 to Respondent's Motion for Summary Judgment at 6-7.) The above findings are presumed correct on federal habeas review. See § 2254 (e)(1). Moreover, the MAR court adjudicated the substance of grounds (1) and (4) on the merits. The MAR court's decision is correct. The adjudication is not contrary to, nor an unreasonable application of, the relevant Supreme Court law, i.e. Blackledge, Boykin, Strickland, and Hill. Furthermore, it is not based upon an unreasonable

determination of the facts in light of the evidence presented in state court. Therefore, Petitioner's claims (1) and (4) are denied pursuant to § 2254(d) and (e).

**B. Ineffective Assistance of Trial and Appellate Counsel Claims (Claims (2), (3) and (8))**

First, Petitioner contends that his counsel was ineffective for failing to request a hearing and move for the destruction of the 1986 non-testimonial products and reports. This claim was raised in slightly different terms, and fully adjudicated against Petitioner in his MAR hearing. (MAR Order, Ex. 19 to Respondent's Motion for Summary Judgment at 6.) The MAR court found, based on Judge Ervin's MAR evidentiary hearing testimony, that his decision not to move to destroy the nontestimonial evidence was a part of his trial strategy, "the proprietary of which is not suspect under the facts of this case." (Id. at 6 ¶ 10(e)). Moreover, even if counsel's actions could somehow be construed as deficient, Petitioner cannot satisfy the prejudice prong of the Strickland test. A motion for the destruction of the nontestimonial evidence would not have been granted at the time of Petitioner's criminal prosecution because probable cause then existed to retain the evidence. See, Pearson, 356 N.C. at 24-28; see also N.C.G.S. §15A-280 (1999) ("If , at the time of the return, probable cause does not exist to believe that the person has committed the offense named in the affidavit or any other offense, the person named in the affidavit is entitled to move that the authorized judge issue an order directing that the products and reports of the nontestimonial identification procedures, and all copies thereof, be destroyed. The motion must, except for good cause shown, be granted.") Moreover, as discussed by the North Carolina Supreme Court in the context of a different issue, the record reveals that there was sufficient evidence to obtain a search warrant for a blood sample even if the NIO evidence had been destroyed. Agent Suttle outlined the following evidence in procuring the 1998 search warrant that led to obtaining a sample of

Petitioner's blood: the FBI Behavioral Science Unit's review of the cases concluded that in all probability, all three Morganton rapes were committed by the same person; Petitioner was found engaging in unusual activity near the scene of one of the rapes; Petitioner did not want to cooperate with authorities after the investigation focused on him; Petitioner engaged in bizarre behavior in both North Carolina and Maryland resulting in at least eight convictions for secret peeping; similar modus operandi in the three rapes; none of the victims had promiscuous tendencies or careless attitudes which would classify them as at a risk for being a victim of violent crime and Agent Suttle's professional opinion that the secret peeping of Petitioner was indicative of something other than voyeuristic pleasures, namely stalking and selecting victims. State v. Pearson, 566 S.E. 2d 50, 59-60 (N.C. 2002). The North Carolina Supreme Court determined that the foregoing evidence made clear that Agent Suttle and the State Bureau of Investigation had probable cause to obtain the 1998 search warrant regardless of whether the NIO evidence was destroyed. Id. at 58-59. Therefore, Petitioner cannot establish the prejudice prong of the Strickland test for his counsel's alleged deficient performance.

The MAR court's adjudication on the merits of this claim is correct. The factual finding upon which it is based, e.g., that Petitioner's attorney made a tactical decision not to pursue the destruction motion, is presumed correct on federal habeas review. See § 2244(e)(1). The adjudication is not contrary to, nor involves an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, i.e. Strickland. Moreover, the factual findings upon which it is based are reasonable in light of the evidence presented. Therefore, Petitioner's claim (2) that his counsel was ineffective for failing to request a hearing and move for the destruction of the 1986 non-testimonial products and reports is denied pursuant

17

to § 2254(d) and (e).

Next, Petitioner contends that his "counsel's advice to plead guilty was tainted by his incompetent representation for the suppression of evidence." (Motion at 8.) To the extent that ground (3) challenges counsel's advise to plead guilty, such claim, as discussed above, is without merit. As previously discussed, Petitioner cannot prove that counsel's advise to plead guilty was deficient or that, if there was deficiency in such advise, there is a reasonable probability that an objectively reasonable person in his position would not have pled guilty and would have insisted on going to trial. Moreover, the MAR court found that Petitioner's counsel properly advised him in all matters relating to his plea and concluded that counsel was effective. (MAR Order, Ex. 19 to Respondent's Motion for Summary Judgment at 6 ¶ 10.f. and 7 ¶ 3.) This adjudication is correct. The factual findings upon which the adjudication is based are presumed correct on federal habeas review. See § 2254(e)(1). The adjudication is not contrary to or an unreasonable application of, the relevant law., Strickland and Hill and it is not based upon unreasonable findings of fact in light of the evidence presented . Therefore, Petitioner's claims (3) is denied pursuant to §2254 (d) and (e).

To the extent that Petitioner is arguing in ground (3) that his attorney, acting in his capacity as trial counsel, did not properly argue issues regarding the suppression of evidence, this claim is also without merit.[10] A review of counsel's motion to suppress and suppression hearing arguments indicate that, generally, counsel raised much of what Petitioner now claims he did not. (Motion to Suppress, Ex. 2 to Respondent's Motion for Summary Judgment at 48-118.) For

---

[10] To the extent that Petitioner is claiming in ground (3) that counsel was ineffective in arguing suppression issues on appeal, such claim is also without merit.

example, counsel made reasonable and persuasive arguments in his motion showing the importance of the interest involved in granting the motion, the extent to which there was a deviation from lawful conduct in gathering the nontestimonial evidence, the willfulness of the statutory violation involved and the extent to which exclusion of the nontestimonial evidence would tend to deter further violations.  (Id. at 52-53.)  Contrary to Petitioner's assertions, counsel clearly challenged the search as unreasonable.  Moreover, some of the issues Petitioner claims should have been argued and supported with relevant case law were never contested by the State.  Most glaring among them is Petitioner's claim that counsel should have argued issues concerning the breach of his bodily integrity and expectation of privacy, the triggers for his standing to contest the search for and seizure of the nontestimonial identification evidence.

Petitioner raised the substance of ground (3), as it pertains to counsel's proficiency in arguing Fourth Amendment issues, in his MAR.  The MAR court denied Petitioner's claim on the merits, finding and concluding:

> 5.      . . . The Court further finds form a review of the arguments advanced by Pearson, the transcript of the January 10 and 11, 2000 proceedings and the appellate decisions that Ervin by necessary implication raised "standing" to contest the admissibility of evidence in both statutory and constitutional contexts.  Further, the Court finds that "standing" by implication was made to all "search and seizure issues attendant to this case.  Moreover, the State never contested Pearson's standing to raise the issues, constitutionally or procedurally, which grounded the objectives of Pearson's motions to suppress.  The trial court and appellate courts addressed the underlying issues without pausing to consider Pearson's right to assert them.  Contrary to Pearson's urgings, the trial and appellate courts by implication agreed he had standing, they just did not agree with his conclusions.

> 10.a.   Ervin zealously represented Pearson throughout the period of his engagement;

19

      c.      Ervin was not negligent in his investigation or advising Defendant concerning pre-trial matters;

      d.      Petitioner's ineffective assistance of counsel contentions relating to his motions to suppress take the following circuitous route: "If my motions to suppress were not granted, it must have been either they [sic] was they were drafted or the way the drafter argued them." The Court finds that neither conclusion exists. There is no evidence raising a constitutionally suspect question concerning either the drafting of the motions or the drafter's argument in pursuit of the motions.

      3.      Robert Ervin afforded Petitioner effective, competent, reasonable, and professional representation throughout the proceedings[.]

(MAR Order, Ex. 19 to Respondent's Motion for Summary Judgment at 4-7.) This adjudication on the merits is correct. The factual findings upon which the adjudication is based are presumed correct on federal habeas review. See 2254 (e)(1). The adjudication is also not contrary to , or an unreasonable application of, the relevant law. i.e. Strickland and Hill and it is not based upon unreasonable findings of fact. Therefore, Petitioner's ground (3), as it pertains to counsel's performance in arguing Fourth Amendment issues, is denied pursuant to §2254 (d) and (e).

In his final ineffective assistance of counsel claim, Petitioner essentially contends that counsel's performance was deficient, and since it was deficient, it must necessarily be because of a conflict of interest. In support, Petitioner advances the same ineffective assistance of counsel claims as above and asks the Court to consider his claim in the aggregate to see that there was an actual conflict of interest.

In order to establish a conflict of interest claim, a petitioner must show that his attorney had an actual conflict on interest, Cuyler v. Sullivan, 446 U.S. 335, 348 (1980); Mickens v. Taylor, 535 U.S. 162 (2002), meaning counsel "actively represent[ed] conflicting interests." United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991). If there is such a conflict, and it adversely affects the attorney's performance, prejudice is presumed. Cuyler, 446 U.S. at 348-50.

None of Petitioner's allegations evince a conflict of interest, nor do the allegations

individually state claims for ineffective assistance of counsel under the <u>Strickland</u> test.  The bulk

of the individual allegations of ineffective assistance of counsel supporting ground (8) relate to

counsel's performance in arguing the Fourth Amendment issues.[11] [12] As discussed in the previous

section regarding ground (3), Petitioner's counsel was not deficient in arguing the Fourth

Amendment issues prior to the plea hearing or on appeal.

Petitioner raised the substance of ground (8) in his MAR and the MAR court found that

"Ervin was never placed in a position of conflict of interest." (MAR Order, Ex. 19 to

Respondent's Motion for Summary Judgment at 5 ¶ 10.b.)  Based upon this and other relevant

findings, the MAR court concluded that Petitioner's attorney was effective.  (<u>Id</u>. at 7 ¶ 3.)  This

adjudication on the merits is correct.  It is not contrary to or an unreasonable application of, the

relevant law. i.e. <u>Strickland</u>, <u>Cuyler</u> and <u>Mickens</u> and it is not based upon unreasonable findings

of fact.  Therefore, Petitioner's claims (3) is denied pursuant to §2254 (d) and (e).

## C. Propriety of the Adjudication of Fourth Amendment Issues (Grounds (5), (6) and (7))

Petitioner alleges violations of his Fourth Amendment rights because: (1) admission of

---

[11] Petitioner's remaining claims presented in support of ground (8) seem to be part of Petitioner's theory that counsel and the trial judge were involved in some kind of conspiracy with the State to thwart an unrelated matter he had pending with the North Carolina Department of Social Services and/or what appears to be a lawsuit regarding that and other matters.   The Court notes that none of the documentary evidence Petitioner has presented supports his allegation that there was a conspiracy against him.  Notably, the MAR court concluded that there was no prosecutorial misconduct or judicial bias.  (MAR Order, Ex. 19 to Respondent's Motion for Summary Judgment at 5 ¶¶ 7 and 8.)

[12] Petitioner filed a Motion to Amend (Doc. No. 57) claim 8 to include a claim that "counsel abandoned his duty of loyalty to his client."  The Court notes that this clarification to his claim does not alter the Court's analysis.

hair and saliva DNA evidence was based on erroneous or unreasonable application of the Terry[13]

doctrine; (2) admission of hair and saliva DNA evidence was contrary to Davis v. Mississippi,

and United States v. Place; and (3) admission of hair and saliva DNA evidence was based on an

unreasonable determination of the facts in light of the evidence. Grounds (5), (6) and (7) all

concern the adjudication of Petitioner's Fourth Amendment issues in state court. The record

indicates that Petitioner had a full and fair opportunity to raise these Fourth Amendment issues at

his suppression hearing and on direct appeal. These claims were meticulously reviewed during

those proceedings. Accordingly, Petitioner is barred from raising these grounds for relief on

federal habeas review. See Stone v. Powell, 428 U.S. 465, 494 (1976) (providing that "where

the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a

state prisoner may not be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial."). [14]

## V. ORDER

**THEREFORE IT IS HEREBY ORDERED** that

(1)     Respondent's Motion for Summary Judgment (Document No. 16) is **GRANTED**;

(2)     Petitioner's § 2254 Motion (Document No. 1) is **DENIED** and **DISMISSED**; and

(3)     Petitioner's Motion for Judgment on the Pleadings (Doc. No. 24); Motion for

         Judgment as a Matter of Law (Doc. No. 48) and Motion for Summary Judgment

---

[13] Terry v. Ohio, 392 U.S. 1 (1968).

[14] The Court is aware that Petitioner contends that Stone v. Powell does not apply because the state court's determination of these issues was unreasonable. (Doc. No. 58). The Court has reviewed the State court's determination of the Fourth Amendment issues and concludes that such determination was not unreasonable.

(Doc. No. 56)  are **denied**;

(4)    Petitioner's Motion for an Order of Compliance (Doc. No. 59); Motion for

Financial Assistance to Obtain Expert Services (Doc. NO. 60); and Petitioner's

Motion to Produce Documents (Doc. No. 62) are denied as moot.

(5)    All other outstanding motions are denied.


**SO ORDERED**.


Signed: September 4, 2008

Graham C. Mullen
United States District Judge